# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **Brian Lumbus, Jr.,** | **Case No.  1:25-CV-00190** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Huntington Bank, et al.,** | **MEMORANDUM OPINION & ORDER** |
| **Defendants** | |

On February 7, 2025, Defendant Huntington National Bank ("Huntington") filed a Motion to Dismiss ("Huntington's Motion") (Doc. No. 5), Defendant Early Warning Services, LLC ("EWS") filed a Motion to Dismiss ("EWS's Motion") (Doc. No. 6), and EWS filed a Request for Judicial Notice ("EWS's Request"). (Doc. No. 7).[1]

On February 21, 2025, Plaintiff Brian Lumbus, Jr. filed his Brief in Opposition and Amended Brief in Opposition to EWS's Motion ("Lumbus's Opposition" and "Lumbus's Amended Opposition"). (Doc. Nos. 8, 9.) On March 7, 2025, EWS filed its Reply Brief in Support of its Motion ("EWS's Reply").  (Doc. No. 10.)

On June 9, 2025, Lumbus filed his Motion for Summary Judgment ("Lumbus's Motion") (Doc. No. 11).   On July 17, 2025, EWS filed its Opposition to Lumbus's Motion ("EWS's Opposition") and Huntington filed a Motion for Continuance to Respond to or in the Alternative in Opposition to Lumbus's Motion ("Huntington's Motion for Continuance").  (Doc. Nos. 17, 16.)  On

---

[1] This action was originally filed in the Cuyahoga County Court of Common Pleas on December 24, 2024, and Plaintiff named Huntington Bank and Zelle as defendants.  (Doc. No. 1-3 at PageID# 14.)  On January 31, 2025, EWS filed a Notice of Removal and attached thereto a Notice of Filing Notice of Removal indicating that it was erroneously named as Zelle in Plaintiff's Complaint.  (Doc. Nos. 1, 1-4 at PageID# 62.)

August 15, 2025, Lumbus filed two Motions for Leave to File Amended Motions for Summary Judgment against EWS and Huntington ("Motions for Leave"). (Doc. Nos. 18, 19.)

For the reasons set forth below, Huntington's Motion and EWS's Motion are GRANTED IN PART and this Court dismisses Plaintiff's claims for violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* EWS's Request is DENIED. (Doc. No. 7.) Lumbus's Motion, Huntington's Motion for Continuance, and Lumbus's Motions for Leave are DENIED as moot. (Doc. Nos. 11, 16, 18, 19.) And, because the Court declines to exercise supplemental jurisdiction over Lumbus's state law claims, this action is remanded to the Cuyahoga County Court of Common Pleas.

## I.      Background

### A.      Plaintiff's Allegations

Lumbus alleges that "[o]n or about December 2, 2023, Plaintiff notified Huntington Bank of an overdraft in his checking account due to unauthorized and fraudulent Zelle transactions. Plaintiff explained to the bank that he was currently incarcerated and had no access to a computer; his only means to access the account was via the use of his debit card." (Doc. No. 1-3 at PageID# 14.) Huntington "acknowledged the situation and stated that they would investigate the matter." (*Id.* at PageID# 15.) Then, Huntington "canceled the existing debit card, ordered a new one for which Plaintiff paid a $25 rush delivery fee, and assured Plaintiff that they would shut down the Zelle account linked to his checking account." (*Id.*)

Lumbus "informed Huntington Bank that the Zelle account had been fraudulently set up" and "Huntington Bank informed Plaintiff that opening a new Zelle account would require him to visit a branch location." (*Id.*) Plaintiff "reiterated his current incarceration, and stated that his only use of the account would be via the debit card." (*Id.*) "Following this, Huntington Bank initiated a dispute

2

with Zelle regarding the fraudulent transactions," and Lumbus "was told he would receive a credit back to his account.  However, approximately three days later, Zelle denied the dispute, stating the transaction was consistent with account activity." (*Id.*) Lumbus "[r]equested the dispute be reopened, but Zelle denied the dispute on two additional occasions, and Plaintiff had to pay a $30 overdraft fee to restore his account balance." (*Id.*)

At an unspecified time in February 2024, Lumbus "deposited over $3,000 into his checking account[.]" (*Id.*) On March 28, 2024, Lumbus "attempted to use his debit card to deposit money into his inmate phone account, but the transaction was declined.  Upon inquiring with the bank, Plaintiff was informed that his account was overdrawn by $300." (*Id.*) But Lumbus "contested this, stating that his account had a positive balance of over $3,000, making it impossible for there to be insufficient funds." (*Id.*) However, Huntington "identified three (3) unauthorized Zell transactions" as follows: (1) March 21, 2024: $1,000; (2) March 22, 2024: $1,000; and (3) March 25, 2024: $803.75. (*Id.*)

He then "informed Huntington Bank that these transactions were fraudulent and unauthorized. Huntington Bank initiated another investigation, but after a brief inquiry, both Huntington Bank and Zelle denied the dispute.  They provided Plaintiff with information about the fraudulent transactions, including a phone number[,] which Plaintiff identified as belonging to [his] ex-girlfriend, Talanda Woods." (*Id.*)

Lumbus "notified Huntington Bank that he recognized the number and intended to file a police report." (*Id.*) He "believed" that Ms. Woods "stole his account information from his 93-year-old grandmother's house." (*Id.*) He "promptly filed a police report . . . and informed the bank of the steps taken to seek justice." (*Id.*) Lumbus alleges that Huntington "conducted another investigation, revealing that Ms. Woods had removed Plaintiff's grandmother's phone number from his account in

September 2023, replacing it with her own, and subsequently opened a Zelle account." (*Id.* at PageID# 16.) Lumbus alleges that "[f]rom October 2023 onward, Ms. Woods engaged in fraudulent transactions, including: $97.00 on October 20, 2023; $266.55 on October 20, 2023; $120.00 on October 23, 2023; $90.00 on November 3, 2023; $162.00 on November 6, 2023; $1,000 on November 14, 2023; and $742.00 on November 15, 2023." (*Id.*) According to Lumbus, "[d]espite this clear evidence of fraud, Huntington Bank and Zelle failed to properly protect Plaintiff's account or credit the amounts taken fraudulently." (*Id.*)

### B. Procedural History

On December 24, 2024, Lumbus filed the Complaint in the Cuyahoga County Court of Common Pleas. (Doc. No. 1-3 at PageID#s 1, 14.) Therein, he asserts claims against Huntington and EWS for the following: (1) violations of the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code § 1345 *et seq.*; (2) violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*; (3) Negligence; and (4) Breach of Contract (against Huntington only) (*Id.* at PageID#s 16-17.) On January 31, 2025, EWS filed the Notice of Removal, thereby removing the case to this Court. (Doc. No. 1.)

On February 7, 2025, Huntington and EWS filed their respective Motions, and EWS filed its Request. (Doc. Nos. 5-7.) On February 21, 2025, Lumbus filed his Opposition and Amended Opposition to EWS's Motion, but he did not file a brief in opposition to Huntington's Motion. (Doc. Nos. 8, 9.) On March 7, 2025, EWS filed its Reply. (Doc. No. 10.)

On June 9, 2025, Lumbus filed his Motion. (Doc. No. 11.) On July 17, 2025, Huntington filed its Motion for Continuance. (Doc. No. 16.) Also on July 17, 2025, EWS filed its Opposition to

4

Lumbus's Motion.  (Doc. No. 17.)  On August 15, 2025, Lumbus filed his Motions for Leave.  (Doc. Nos. 18, 19.)

## II.    Standard of Review

Under Rule 12(b)(6), the Court accepts Lumbus's factual allegations as true and construes the Complaint in the light most favorable to him.  *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  To survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the complaint raises a right to relief above the speculative level— "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'"  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555-56).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

Consequently, the examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim

5

is and the grounds upon which it rests." *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper technical, code pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

## III.    Analysis

### A.    Lumbus's EFTA Claim Against EWS

EWS argues that the EFTA imposes error resolution obligations only on entities that qualify as "financial institutions" with respect to a given transaction, and because EWS did not act as a "financial institution" in connection with the Zelle transactions at issue, Lumbus's EFTA claim against it is defeated as a matter of law.  (Doc. No. 6 at PageID#s 139-40.)  EWS correctly asserts that the EFTA defines a "financial institution" as "'a State or National bank, a State or Federal savings and loan association, a mutual savings bank, a State or Federal credit union, or any other person who, directly or indirectly, holds an account belonging to a consumer. 15 U.S.C. § 1693a(9).'"  (Doc. No. 6 at PageID# 140.)  And EWS correctly acknowledges that "Regulation E defines the term somewhat more broadly, to include 'a bank, savings association, credit union, or any other person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with a consumer to provide electronic fund transfer services. 12 C.F.R. § 1005.2(i).'"  (*Id.*)

In support of its argument that it is not a "financial institution" as defined by § 1693a(9) of the EFTA and Regulation E, 12 C.F.R. § 1005 *et seq.*,[2]  EWS cites *Tristan v. Bank of Am.*, 2023 WL

---

[2] "The EFTA is implemented by Regulation E, 12 C.F.R. 1005 *et seq.*, which also contains official interpretations." *Blatt v. Cap. One Auto Fin., Inc.*, 237 F. Supp. 3d 688, 691 (M.D. Tenn. 2017).

8168848 (C.D. Cal. Oct. 26, 2023), *reconsideration denied*, 2023 WL 8945714 (C.D. Cal. Dec. 5, 2023), where the court addressed whether EWS was a "financial institution" subject to the requirements of the EFTA.  In *Tristan*, the court found that EWS was not a "financial institution" subject to the requirements of the EFTA because the plaintiff could not allege either that EWS directly holds an account belonging to a consumer or that EWS issued access devices.  Accordingly, EWS contends that as in *Tristan*, since EWS did not "issue an access device, enter into any agreement with Plaintiff to provide electronic fund transfer services, or engage in the electronic transfer of funds," it cannot be held liable to Lumbus.  (Doc. No. 6 at PageID# 140.)  According to EWS, "Plaintiff's relationship was with Huntington: his agreement was with Huntington; his account was with Huntington; any access devices to make transactions from his Huntington checking account would be issued by Huntington; the funds at issue were transferred from Plaintiff's account at Huntington; and the money at issue was transferred by Huntington, not EWS."  (*Id.* at PageID#s 140-41.)

In his Amended Opposition, Lumbus argues that EWS's "interpretation is incorrect for two reasons[.]" (Doc. No. 9 at PageID# 214.)  First, Lumbus argues that the Consumer Financial Protection Bureau ("CFPB") and "courts have held companies like EWS liable under the EFTA." (*Id.*)  He claims that the CFPB "has explicitly stated that P2P payment networks like Zelle fall under the scope of the EFTA."  (*Id.*)  In support, he cites to *Consumer Financial Protection Bureau v. Early Warning Services, LLC*, Case No. 2:24-cv-3652 (D. Ariz. Dec. 20, 2024),[3] contending that it "proves that EWS has a history of failing to protect consumers from fraudulent transactions[.]"  (*Id.*)  And citing to *New York v. Citibank, N.A.*, 763 F. Supp. 3d 496 (S.D.N.Y. 2025), Lumbus asserts that

_____

[3] As EWS notes in its Reply, the citations Lumbus uses in his Amended Opposition are inaccurate, so the Court refers to the cases with their accurate citations.  (Doc. No. 10 at PageID# 10.)

"[c]ourts have held that companies involved in electronic payments can be liable under EFTA[.]" (*Id.*)

Second, Lumbus argues that EWS is "not just a [payment] network" because it "directly influences transactions" by "manag[ing] the rules and processes of Zelle [and] determining how transactions are executed," but that in Lumbus's case, EWS "failed to implement" its "fraud prevention and detection tools[.]" (*Id.*) Thus, according to Lumbus, EWS is "liable under EFTA" because EWS "directly controlled the process by which Plaintiff's funds were removed[.]" (*Id.*)

In its Reply, EWS reiterates its argument that EWS is not a "financial institution," and emphasizes that Lumbus's second argument amounts to new allegations not set forth in the Complaint. (Doc. No. 10 at PageID#s 219-20.) EWS counters Lumbus's assertion that the CFPB has determined that "P2P payment networks like Zelle fall under the scope of the EFTA" by pointing to the CFPB's non-binding FAQs (hereinafter, "CFPB Elec. Fund Trans. FAQs") listed on the CFBP's website.[4] (*Id.* at PageID#s 220-21.) On that website, the CFPB presents the following question as one such 'frequently asked question': "Can non-bank P2P payment providers be considered financial institutions under Regulation E?" *See* CFPB Elec. Fund Trans. FAQs. The CFPB then directly answers that question by citing to Regulation E:

> Non-account-holding providers of P2P payment or bill payment services are considered covered financial institutions **if the provider issues an access device and agrees with a consumer to provide EFT services**.

*Id.* (citing 12 C.F.R. § 1005.2(i)) (emphasis added).

---

[4] *Electronic Fund Transfers FAQs*, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/ (last visited Aug. 15, 2025).

EWS further notes that the CFPB's enforcement action against EWS in *Consumer Financial Protection Bureau v. Early Warning Services, LLC* "had not progressed past the pleading stage" and was "dismissed by the CFPB with prejudice [,]" so the allegations in the complaint filed therein could not "prove" that EWS would be liable under the EFTA.  (*Id.* at PageID# 221.)  EWS also distinguishes *Citibank* on the basis that the case did not discuss the meaning of a "financial institution" under the EFTA.  (*Id.* at PageID# 222.)

"The EFTA lays out the rights and liabilities of consumers and financial institutions for unauthorized electronic fund transfers."  *Mich. First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 431 (6th Cir. 2024).  As the Sixth Circuit has explained, the EFTA is a remedial statute designed to protect consumers and, therefore, must be given "'a broad, liberal construction in favor of the consumer.'"  *Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 353 (6th Cir. 2008) (quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n,* 163 F.3d 948, 950 (6th Cir. 1998)); *Pinkston Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 851 (W.D. Mich. 2016).  The EFTA requires "financial institutions" to investigate errors contained in a consumer's account and limits the liability of consumers for unauthorized electronic fund transfers.[5]  15 U.S.C. § 1693f; *see also* 15 U.S.C. § 1693g.

Thus, courts have consistently held that "[b]ecause the EFTA governs the conduct of 'financial institutions,' [the] [p]laintiff's complaint must plausibly allege that each Defendant is a 'financial institution.'"  *Edson v. Wells Fargo Bank N.A.*, 2025 WL 890737 at *2 (N.D. Fla. Mar. 5, 2025) (citing *Tristan v. Bank of Am.*, 2023 WL 4417271 at *11-12 (C.D. Cal. June 28, 2023); *Miller v. Interstate Auto Grp., Inc.*, 2015 WL 1806815 at *3-4 (W.D. Wisc. Apr. 21, 2015; and *Katz v.*

---

[5] An "electronic fund transfer means a "transfer of funds . . . so as to order, instruct, or authorize a financial institution to debit or credit an account[.]"  15 U.S.C. § 1693a(7).

*JPMorgan Chase, N.A.*, 2014 WL 699 7625 at *2 (S.D. Fla. Oct. 7, 2014)). Under the EFTA, a "financial institution" means "a State or National bank, a State or Federal savings and loan association, a mutual savings bank, a State or Federal credit union, or any other person who, directly or indirectly, holds an account belonging to a consumer[.]" 15 U.S.C. § 1693a(9). Regulation E defines a "financial institution" as "a bank, savings association, credit union, or any other person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with a consumer to provide electronic fund transfer services[.]" 12 C.F.R. § 1005.2(i). And as EWS points out—and contrary to Lumbus's conclusory assertion otherwise—the CFPB's online FAQs simply confirm the definitions set forth in § 1693a(9) of the EFTA and § 1005.2(i) of Regulation E. *See* CFPB Elec. Fund Trans. FAQs.

In *Tristan*, the Central District of California held that EWS was not a "financial institution" under the EFTA and Regulation E for two reasons: (1) the plaintiffs did "not allege, either in the Complaint or in their Opposition, that EWS either directly or indirectly holds an account belonging to a consumer[,]" and (2) because EWS did not "issue[] an access device" merely by requiring the customers to provide their phone numbers or email addresses when they signed up for Zelle. 2023 WL 8168848 at *5-6.

The Court agrees with *Tristan*'s reasoning and concludes that Lumbus has failed to state a claim against EWS because it is not a financial institution. First, Lumbus has not pled that he maintains an "account" with EWS as that term is used in the EFTA, even though he references a "Zelle account" in the Complaint. (Doc. No. 1-3 at PageID# 15.) In relevant part, an "account" means "a demand deposit, savings deposit, or other asset account[.]" 15 U.S.C. § 1693a(2). Lumbus's Complaint includes bank statements purportedly evidencing the fraudulent transactions,

10

which clearly show that his "account" is simply an "Asterisk-Free Checking Account" ending in -1416 with Huntington, not EWS, and that Woods merely engaged in withdrawal transactions using Zelle from his Huntington checking account.  (Doc. No. 1-3 at PageID#s 22-27.)  Under the "Other Withdrawal / Debit Activity" headline on his bank statements, Lumbus circles each allegedly fraudulent transaction described in the body of his Complaint.  (*Id.*)  Each entry is described as a "Zelle Transaction" followed by the words "money sent to TALANDA WOODS" and the amount of the transaction.  (*Id.*)  Thus, EWS is correct that the Zelle transactions, even if facilitated through a "Zelle account" containing Lumbus's personal identifying information, do not establish that he had a "demand deposit, savings deposit, or other asset account" with EWS.  *See Lion Fed. Credit Union v. Worldpay, LLC*, 2024 WL 1704551 at *10 (S.D. Ohio Apr. 19, 2024) (citing *Tristan*, 2023 WL 4417271 at *11-12) ("Under existing caselaw, a business's possession of personally identifiable information used in connection with financial transactions, does not necessarily mean it indirectly holds customers' financial accounts as a financial institution would.")

Second, like in *Tristan*, Lumbus has entirely failed to allege that EWS "issued" an "access device" or entered into an agreement to provide EFT services for him, when both are required under § 1005.2(i), which defines a financial institution as a person who "issues an access device **and** agrees with a consumer to provide electronic fund transfer services[.]" 12 C.F.R. § 1005.2(i) (emphasis added).  "Under Regulation E, an 'access device' is a 'card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers.'" *Tristan v. Bank of Am.*, 2023 WL 4417271 at *11 (C.D. Cal. June 28, 2023) (quoting 12 C.F.R. § 1005.2(a) (1)).  The Complaint does not set forth allegations that EWS issued Lumbus a "means of access" to his Huntington account, but rather, that EWS merely allowed

11

someone else (Woods) to use her *already*-issued phone number to access his Huntington account. *See id*. ("Plaintiffs cannot plausibly allege that EWS 'issues' phone numbers or email addresses to its users. Instead, EWS requires that all consumers enroll a valid mobile phone number or email address before EWS will provide EFT services. Since having a valid email address or phone number is a prerequisite to enrolling in the Zelle service, EWS cannot be deemed an entity that issues access devices to its users."). Thus, EWS did not issue an access device to Lumbus or to Woods.

Also, in his Complaint, Lumbus does not allege that EWS "agree[d] with [Lumbus] to provide electronic fund transfer services" for him. 12 C.F.R. 1005.2(i). To the contrary, Lumbus alleges that it was Woods, not Lumbus, who "subsequently opened a Zelle account" to engage in the fraudulent transaction after she "removed Plaintiff's grandmother's phone number from his account in September 2023, replacing it with her own[.]" (*Id.* at PageID# 16.) Lumbus alleges that "the Zelle account had been fraudulently set up"— which means that *he* never agreed to permit EWS to provide EFT services for him. (*Id.* at PageID# 15.) For that same reason, even if the Court could take judicial notice of the Zelle Service Addendum to Huntington Online Services Agreement (the "Service Addendum"),[6] the Court is not convinced that it would constitute an agreement between Lumbus and

---

[6] Although not dispositive of any issue in this Opinion, the Court notes that it cannot take judicial notice of the Service Addendum at this stage of the proceeding. EWS asks the Court to take judicial notice because the Service Addendum is "integral to Plaintiff's claims" and because "Plaintiff cannot reasonably dispute the [Service Addendum's] authenticity." (Doc. No. 7 at PageID# 156.) First, EWS concedes that "[a] district court may consider documents submitted by the defendant without converting a motion to dismiss to a motion for summary judgment if they are 'referred to in the pleadings' *and* 'integral to the claims.'" *Moyer v. Gov't Emps. Ins. Co.*, 114 F.4th 563, 568 (6th Cir. 2024) (emphasis added). (*Id.*) Being "integral to the claims" alone is not enough, so even assuming the Service Addendum were integral to Lumbus's claims, he did not refer to the Service Addendum (or as noted above, any agreement with EWS) in his Complaint. Second, EWS does not offer any support for its supposition that the Service Addendum's authenticity "cannot reasonably be questioned[,]" *Clark v. Walt Disney Co.*, 642 F. Supp. 2d 775, 782 (S.D. Ohio 2009), except its own averment that it "is a true and correct copy of the Huntington Bank Zelle Addendum effective October 2022." (*Id.* at PageID# 155.) But the Service Addendum does not contain Lumbus's signature or any other mark of its authenticity, so it is unclear why the authenticity of the Service Addendum would be beyond reasonable dispute. Of course, even if the Court were to take judicial notice, for the reasons outlined above, it would make no difference because the Complaint

EWS.  (Doc. No. 7.)  In the very first sentence of the Service Addendum, it purports to "govern your use of the Zelle® Money Transfer Service[,]" but the allegations do not establish that he ever used the Zelle Money Transfer Service, so the Service Addendum had nothing to "govern."  (*Id.* at PageID# 198.)[7]  And Lumbus appears to tacitly acknowledge that he and EWS did not form an agreement because he only asserts his breach of contract claim against Huntington, not EWS.  (*Id.* at PageID# 17.)

Next, the Court also agrees with EWS that Lumbus's reference to *Citibank* is inapposite because in that case, the court was not analyzing whether Citibank was a "financial institution" under § 1693a(9) of the EFTA.  In fact, the first substantive sentence of the opinion admits that "Citibank is a large financial institution that offers its customers 'online and mobile banking services." *Citibank*, 763 F. Supp. 3d at 503.  Instead, the court was determining the meaning of "electronic funds transfer" and "unauthorized electronic funds transfer" under §§ 1693a(7) and 1693a(12) of the EFTA. *See id.* at 507-15.

Finally, Lumbus's contention in his Amended Opposition that EWS is a "financial institution" because it "directly influences [t]ransactions" and "directly controlled the process by which Plaintiff's funds were removed" is not supported by the text of Regulation E.  As noted above, a financial institution "means a bank, savings association, credit union, or any other person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with

---

does not show that Lumbus used Zelle, and thus does not establish an agreement for EWS to provide EFT services under 12 C.F.R. § 1005.2(i).

[7] EWS also apparently filed the wrong copy of the Huntington Consumer Deposit Agreement.  Unlike Huntington, which uploaded a Huntington Consumer Deposit Agreement "[e]ffective as of May 7, 2023" (before the fraudulent transactions occurred), EWS uploaded a Huntington Consumer Deposit Agreement "[e]ffective as of August 1, 2024" (after the fraudulent transactions occurred).  (*Compare* Doc. No. 5-1 at PageID# 83 *with* Doc. No. 7 at PageID# 160.)

a consumer to provide electronic fund transfer services[.]"  12 C.F.R. § 1005.2(i).  Thus, neither the "influence" a defendant has over a consumer's transactions, nor that defendant's "control" over the fund removal process qualifies a defendant as a financial institution subject to liability.  *See id.*  And even if those allegations did suffice, they would amount to new allegations that the Court cannot consider.  *See Davison v. City of Lorain*, 2024 WL 2845968 at *6 (N.D. Ohio June 5, 2024) (quoting *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020)) (Barker, J.) (dismissing pro se plaintiff's complaint and explaining that a party "cannot amend his complaint in an opposition brief or ask the court to consider new allegations not contained in the complaint.") (cleaned up).

Accordingly, because Lumbus has not properly alleged that he maintained an "account" with EWS, that EWS issued him an "access device," or that he entered into an agreement with EWS to obtain EFT services from EWS, the Court concludes that EWS is not a "financial institution" and therefore EWS is not subject to liability under the EFTA.  Thus, Count One against EWS is dismissed with prejudice.

### B.  Lumbus's EFTA Claim Against Huntington

Huntington contends that Lumbus has failed to state a claim for two reasons.  First, Huntington argues that the transactions from October and November 2023 (the "Autumn Transactions") are time-barred by the EFTA's one-year (1) statute of limitations under 15 U.S.C. § 1693m(g) because Lumbus did not file the Complaint until December 24, 2024, more than one year (1) after "the dates of the alleged Autumn Transactions."  (Doc. No. 5 at PageID#s 74-75.)  Second, Huntington argues that Lumbus has failed to sufficiently plead his EFTA claim because he has not met the plausibility standard of Rule 8.  (*Id.* at PageID#s 75-76.)  As noted above, Lumbus did not file a brief in opposition to Huntington's Motion.

14

"[T]he EFTA and its implementing regulation [Regulation E] contain specific notice requirements with which the consumer must comply before the financial institution is required to take action." *Ghalchi v. U.S. Bank, N.A.*, 2015 WL 12655402 at *8 (C.D. Cal. Jan. 8, 2015). "Under the EFTA, a financial institution has a duty to investigate alleged errors after the consumer has given the institution notice of the error." *Hernandez v. Rodriquez*, 2014 WL 11515008 at *3 (D. Ariz. Apr. 30, 2014). "A complaint that doesn't allege that a consumer provided timely notice doesn't state a claim under the EFTA." *Beaman v. Bank of Am., N.A.*, 2024 WL 3219224 at *12 (D.N.J. June 28, 2024) (quoting *In re Bank of Am. California Unemployment Benefits Litig.*, 674 F. Supp. 3d 884, 906 (S.D. Cal. 2023)). Thus, to state a claim under the EFTA for a failure to investigate an error with a consumer's account, a plaintiff must plead facts indicating that he complied with the EFTA's error resolution process under the EFTA and Regulation E. *See Savage v. Chase Bank*, 2019 WL 4413053 at *2-3 (S.D. Ohio Sept. 16, 2019) (citing *Cifaldo v. BNY Mellon Inv. Serv. Trust Co.*, 2017 WL 6513342 at *1-2 (D. Nev. Dec. 19, 2017)) ("The EFTA contains an error resolution process which obligates consumers to report transfer errors to financial institutions within 60 days after having been transmitted the written documentation containing the error."). Additionally, under § 1693m(g) "any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g).

### 1. Statute of Limitations

The Court begins by addressing Huntington's statute-of-limitations argument. First, Huntington is not correct that Lumbus was required "to file this action within one year of the Autumn Transactions, or in October or November 2024." (Doc. No. 5 at PageID# 75.) Rather, a violation of

the EFTA accrues when the financial institution violates the EFTA, not when the consumer is subject to an unauthorized fraudulent transfer.  *See Whittington v. Mobiliol Fed. Credit Union*, 2017 WL 6988193 at *12 (E.D. Tex. Sept. 14, 2017) (holding that because "15 U.S.C. § 1693m imposes civil liability on an institution that fails to comply with the provisions of EFTA," "[t]he timeliness of an EFTA claim, therefore, depends upon when the occurrence of the alleged violation took place.")[8] That interpretation follows logically from the context of Huntington's alleged violation "for failure to adequately investigate the unauthorized Zelle transactions and refusal to credit Plaintiff's account[.]"  (Doc. No. 1-3 at PageID# 16.)  Although Woods fraudulently ordered Huntington to transfer money from Lumbus's account in October and November 2023, Huntington's obligation to investigate under the EFTA could only have arisen *after* Lumbus provided the required notice to Huntington under § 1693f.  *See Hernandez*, 2014 WL 11515008 at *3.

Nevertheless, Huntington is correct that Lumbus's EFTA claim based on the Autumn Transactions is time-barred.  In paragraph one of the Complaint, Lumbus alleges that he first notified Huntington of the fraudulent transactions "[o]n or about December 2, 2023[.]"  (Doc. No. 1-3 at PageID# 14.)   In paragraphs two and three, he describes how Huntington responded to that

---

[8] The Court notes that in *Wike v. Vertue, Inc.*, 566 F.3d 590 (6th Cir. 2009), the Sixth Circuit addressed the timeliness of "recurring transfers" from a consumer's bank account under § 1693m(g) in a different context than the one before the Court. *Id.* at 593. Although Lumbus alleges that he suffered repeated transfers from his account by Woods, *Wike's* "recurring transfer" rule is not applicable to this case.  The "transfers" the court referred to in *Wike* were "preauthorized transfers," which the EFTA defines as "an electronic fund transfer authorized in advance to recur at substantially regular intervals," not "unauthorized transfers" as Lumbus has alleged here.  *Compare* 15 U.S.C. 1693f(12) *with* 15 U.S.C. § 1693a(10). The court in *Wike* held that "the one-year limitations period began when the first recurring transfer took place, not when Vertue [the defendant financial institution] arranged it[,]" reasoning that "[a] consumer is injured only if, and only when, funds are withdrawn from her account." *Wike*, 566 F.3d at 593 (citing *Wachtel v. West*, 476 F.2d 1062, 1065-66 (6th Cir. 1973)).  Thus, in *Wike*, the court was determining when the financial institution violated the EFTA: on the date when the financial institution *arranged* the series of recurring, preauthorized transfers, or on the date when the first of those preauthorized transfers *occurred*.  *See id.*  Here, Lumbus alleges that Huntington violated the EFTA more than once by failing to investigate and credit his account, so each alleged violation by Huntington would start a new limitations period for that violation.

notification, but he does not provide another timeframe until paragraph four.  (*Id.* at PageID# 15.)  In that paragraph, he alleges: "[f]ollowing this, Huntington Bank initiated a dispute with Zelle regarding the fraudulent transaction" and "approximately three days later, Zelle denied the dispute, stating the transaction was consistent with account activity."  (*Id.*)  Then, in paragraph five, he provides the next date, alleging that he deposited $3,000 in February 2024, and that on March 28, 2024, he attempted to use his credit card.  (*Id.*)  It is clear based on these allegations that even if Huntington violated the EFTA with respect to the Autumn Transactions, it did so by failing to adequately investigate the fraud or credit his account "on or about December 2, 2023" because paragraphs one through four all relate to the same dispute about the same "fraudulent Zelle transactions[,]" i.e., the Autumn Transactions. (*Id.*)  Thus, the Court concludes that Lumbus's EFTA claims with respect to the Autumn Transactions accrued "on or about December 2, 2023[,]" but, Lumbus did not file his Complaint until December 24, 2024, more than one (1) year later.

Accordingly, because the statute of limitations runs for one year from the date Huntington violated the EFTA, Lumbus's EFTA claim with respect to the Autumn Transactions is time-barred.

### 2. Insufficient Pleading

The Court next addresses Huntington's contention that Lumbus's EFTA claim, now limited only to the allegations regarding the March Transactions, fails "because it only contains conclusory allegations, which lack any factual support."  (Doc. No. 5 at PageID# 76.)  Huntington's core argument is that Lumbus did not plead sufficient facts showing that he complied with the EFTA's error resolution process or that Huntington failed to investigate or credit his account.  (*Id.*)

17

### a)        EFTA and Regulation E Error Resolution Framework

Under § 1693f(a) of the EFTA, "If a financial institution, within sixty days after having transmitted to a consumer documentation . . . receives oral or written notice . . . the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days."  15 U.S.C. § 1693f(a).  And "if the financial institution determines that an error did occur, it shall promptly, but in no event more than one business day after such determination, correct the error[.]"  *Id.* § 1693f(b). But "[i]f a financial institution receives notice of an error in the manner and within the time period specified in subsection (a), it may, in lieu of the requirements of subsections (a) and (b), within ten business days after receiving such notice provisionally recredit the consumer's account for the amount alleged to be in error[.]"  *Id.* § 1693f(c).

Regulation E implements §§ 1693f(a)-(c) of the EFTA by providing the applicable "[p]rocedures for resolving errors."  12 C.F.R. § 1005.11.  Like the EFTA, it requires a consumer to provide notice of the alleged error "no later than 60 days after the institution sends the period statement . . . on which the alleged error is first reflected."  *Id.* § 1005.11(b)(1)(i).  Additionally, that notification must "[e]nable the institution to identify the consumer's name and account number" and "[i]ndicate why the consumer believes an error exists and include to the extent possible the type, date, and amount of the error[.]"  *Id.* §§ 1005.11(b)(i)-(ii).

Once the consumer has provided that notice, Regulation E triggers several investigatory obligations for the financial institution under § 1005.11(c).  The financial institution must "investigate promptly[,]" "determine whether an error occurred within 10 business days of receiving a notice of error[,]" "report the results to the consumer within three business days after completing its

investigation," and "correct the error within one business day after determining that an error occurred." *Id.* § 1005.11(c)(1). Alternatively, "[i]f the financial institution is unable to complete its investigation within 10 business days, the institution may take up to 45 days from receipt of a notice of error to investigate and determine whether an error occurred, provided the institution does the following: provisionally credits the consumer's account in the amount of the alleged error (including interest where applicable) within 10 business days of receiving the error notice." *Id.* § 1005.11(c)(2).[9]

Next, sub-section (c)(4), titled "Investigation," provides that "a financial institution's review of its own records regarding an alleged error satisfies the requirements of this section if: (i) The alleged error concerns a transfer to or from a third party; and (ii) There is no agreement between the institution and the third party for the type of electronic fund transfer involved." *Id.* § 1005.11(c)(4)(i)-(ii). Finally, § 1005.11(d) establishes the obligations of a financial institution if it "determines no error or a different error occurred." *Id.* § 1005.11(d). It provides that, "[t]he institution's report of the results of its investigation shall include a *written* explanation of the institution's findings and shall note the consumer's right to request the documents that the institution relied on in making its determination. *Id.* § 1005.11(d)(1) (emphasis added).

### b) Analysis

The Court concludes that Huntington is correct that Lumbus has not adequately pled a claim under the EFTA and Regulation E.

Lumbus's Complaint does successfully allege that he provided timely notice to Huntington regarding the March Transactions because he attaches Huntington's communication, dated May 2,

---

[9] 12 C.F.R. § 1005.11(c)(2) additionally provides exceptions to providing provisional credit not applicable here.

2024, finding that the March Transactions were valid (the "May Communication"). (Doc. No. 1-3 at PageID# 21.) Thus, Lumbus provided a notice to Huntington *after* March 25, 2025 (the last of the March Transactions) but *before* May 2, 2024. (*Id.*) Because he provided notice before May 2, 2024, regarding transactions dated March 21, 22, and 25, 2024, his notice necessarily fit within the sixty-day (60) window established under 15 U.S.C. § 1693f(a) and 12 C.F.R. § 1005.11(a). And his notice also satisfied 12 C.F.R. § 1005.11(b) because it allowed Huntington to identify his name and account number: the May Communication begins "Dear Brian Lumbus" and refers to his "Checking Account: ending in 1416." (*Id.*)

But Lumbus has failed to allege which investigatory obligation under 12 C.F.R. § 1005.11(c) Huntington violated because each of those obligations depends on the financial institution's failure to act within a certain timeframe. Without any pleading regarding the timeliness of Huntington's investigations and reports after Lumbus provided notice, the Complaint is devoid of facts showing that Huntington failed to "investigate *promptly*[,]" "determine whether an error occurred *within 10 business days* of receiving a notice of error[,]" "report the results to the consumer *within three business days* after completing its investigation," or "correct the error within *one business day* after determining that an error occurred." *Id.* § 1005.11(c)(1) (emphasis added).

Additionally, Lumbus's allegations do not support his conclusion that Huntington failed to "adequately investigate the unauthorized Zelle transactions[.]" (Doc. No. 1-3 at PageID# 16.) Because the errors alleged by Lumbus were transfers to third-parties (i.e., Woods, Elisha Harrison, Bernard Holcombe, and "Troy jones"), and because the Complaint does not show that there was an agreement between Huntington and any of those individuals regarding the "type of electronic fund transfer involved," Huntington's "review of its own records" satisfied its obligations under 12 C.F.R.

20

§§ 1005.11(c)(4)(i)-(ii) to investigate the fraudulent transactions.  (*Id.* at PageID#s 22, 25, 26, 30, 31.)[10]

After Huntington "determine[d] no error" occurred, its only obligation was to provide the "written explanation" set forth in 12 C.F.R. § 1005.11(d).  Lumbus alleges that after he "inquir[ed] with the bank, Plaintiff was informed that his account was overdrawn by $300.00," but he does not allege that the explanation was unwritten or that it was otherwise defective.  (*Id.* at PageID# 15.)  And after Huntington "initiated another investigation," Huntington "provided Plaintiff with information about the fraudulent transactions, including a phone number, 216-695-6026, which Plaintiff identified as belonging to an ex-girlfriend, Talanda Woods."  (*Id.*)  Lumbus includes that written explanation as an attachment to his Complaint, and therefore Huntington did not violate § 1005.11(d)(1) as well. (*Id.* at PageID# 20.)

Lumbus also faults Huntington for its "refusal to credit Plaintiff's account[,]" but Huntington's obligation to "correct the error" by crediting his account under § 1005.11(c)(1) would only have arisen "after determining that an error occurred[,]" yet Lumbus alleges that Huntington found that an error did *not* occur, and he merely disputes the accuracy of Huntington's conclusion. (*Id.* at PageID#s 15-16.)  Additionally, Huntington's obligation to extend *provisional* credit to Lumbus under § 1005.11(c)(2) would only have been triggered "if the financial institution is unable to complete its investigation within 10 business days" after it received notice, but as noted above, Lumbus has not alleged that Huntington took longer than ten (10) days to investigate or otherwise failed to timely investigate an alleged error.  *Id.* § 1005.11(c)(1)-(2).

---

[10] Lumbus circled the $97.00 entry on October 20, 2023, as a fraudulent transaction, but the description indicates that the transaction was not money transferred *to* Woods, but instead, was "money received" *from* Woods.  (Doc. No. 1-3 at PageID# 24.)

21

Finally, at an unstated time, Lumbus alleges in paragraph nine that "Huntington Bank conducted another investigation, revealing that Ms. Woods had removed Plaintiff's grandmother from his account in September 2023, replacing it with her own, and subsequently opened a Zelle account" and he proceeds to list the Autumn Transactions. (*Id.* at PageID# 16.)  He attaches to his Complaint the results of Huntington's investigation into two of those transactions, dated April 30, 2024. (*Id.* at PageID# 19.)  But Lumbus does not allege when he notified Huntington of those errors relative to when Huntington investigated them, so the Court is unable to determine if Huntington ever violated its obligations to investigate or provide credit under 15 U.S.C. § 1693f(a) and 12 C.F.R. § 1005.11(c)(1).

Accordingly, even construing the Complaint liberally in favor of Lumbus, he has not pled facts sufficient for the Court to conclude that Huntington failed to adequately investigate or credit his account, and therefore, he has not stated a claim under the EFTA.

### C.    Remand

Having dismissed Lumbus's only federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  The Court lacks diversity jurisdiction under 28 U.S.C. § 1332 because the amount-in-controversy requirement is not satisfied, as Lumbus has only requested $15,300 in damages and additional "unspecified amount[s]." *Cornell v. Fox News Network*, 2020 WL 4530598 at *3 (S.D. Ohio Aug. 6, 2020) ("Plaintiff's complaint seeks 'an unspecified amount of damages,' which is insufficient to meet the amount in controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332(a).").

 Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original

jurisdiction.  "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'"  *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "[A] district court has broad discretion to decide whether to exercise jurisdiction over state law claims."  *Smith v. Erie Cty. Sheriff's Dep't*, 603 Fed. Appx. 414, 424 (6th Cir. 2015).  However, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."  *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996); *accord Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").

Here, the Court exercises its "broad discretion" to conclude that it will not exercise supplemental jurisdiction over Lumbus's remaining state law claims.  *Smith*, 603 Fed. Appx. at 424.  As other courts have recognized, "[t]he interest in avoiding needless decisions on state-law issues as a matter of comity weighs heavily against supplemental jurisdiction."  *Howell v. Buckeye Ranch, Inc.*, 2013 WL 1282518 at *8 (S.D. Ohio Mar. 27, 2013); *see also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) (noting "the Supreme Court's general comity-related principle that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law"); *White v. City of Cleveland, et al.*, 2020 WL 7640932 at *24 (N.D. Ohio Dec. 23, 2020); *Barrio Bros., LLC v. Revolucion, LLC*, 2021 WL 2895509 at *18 (N.D. Ohio July 9, 2021).  Were the Court to retain jurisdiction here, it would be required to delve into purely state law claims and affirmative defenses.  Such purely state-law decisions are better reserved for a state court.

23

Accordingly, the Court declines to exercise supplemental jurisdiction over Lumbus's state law claims and will remand the case to state court.

IV.     **Conclusion**

Accordingly, the for the reasons set forth above, Huntington's Motion and EWS's Motion are GRANTED IN PART AND DENIED IN PART as follows: Huntington's Motion (Doc. No. 5) and EWS's Motion (Doc. No. 6) are GRANTED as to Lumbus's federal claim under the Electronic Fund Transfer Act (Count Two), and DENIED WITHOUT PREJUDICE as to Lumbus's state law claims for violations of the Ohio Consumer Sales Practices Act, Negligence, and Breach of Contract (Counts One, Three, and Four).  EWS's Request (Doc. No. 7) is DENIED.

Additionally, the case is REMANDED to the Court of Common Pleas of Cuyahoga County, Ohio, from which it was removed.  Because the Court has remanded the case, Plaintiff's Motion (Doc. No. 11), Huntington's Motion for Continuance (Doc. No. 16), and Lumbus's Motions for Leave (Doc Nos. 18, 19) are DENIED as moot.

**IT IS SO ORDERED.**

Dated: August 18, 2025                      _s/ Pamela A. Barker_
                                             PAMELA A. BARKER
                                             UNITED STATES DISTRICT JUDGE